UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | ) | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10202-RWZ |
| | ) | |
| EARL DICKERSON | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO:**

1. **MOTION TO SUPPRES EVIDENCE – WARRANTLESS SEARCH (Docket # 22)**
2. **MOTION TO SUPPRESS EVIDENCE (ALLEGED FAILURE TO KNOCK AND ANNOUNCE (Docket # 24)**

**I.   Introduction**

The defendant has filed two motions to suppress evidence. The first seeks to suppress evidence found by police during a warrantless search of one of defendant's automobiles; the second seeks to suppress evidence seized during the search of the defendant's residence pursuant to a search warrant issued by a state court. As more thoroughly discussed below, each of these motions is without merit. With regard to the defendant's motion to suppress the evidence located in his automobile – crack cocaine and a loaded firearm – that evidence was properly seized under the automobile exception to the Fourth Amendment warrant requirement. Moreover, even if the evidence taken from the defendant's car were subject to suppression, it would nonetheless be admissible in a separate sentencing proceeding. See United States v. Acosta, 303 F.3d 78, 86 (2002) (deterrent effect of the exclusionary rule does not outweigh the detrimental effects of excluding reliable evidence on the court's ability to meet its goal of proper sentencing). With regard to the claim asserted in the defendant's second motion – that the police failed to knock and announce themselves before entering the defendant's residence – the government will establish that the claim is untrue. In addition, as discussed below (*see* pp. 13-

16), even if the police had violated the knock-and-announce rule, suppression of evidence seized would be an unjustified remedy. For these reasons, the Court should deny each of the defendants' motions.

## II.     Statement of Facts[1]

### A.     Background

In February 2004, the Boston Police Department ("BPD") received an anonymous tip that Dickerson was in possession of a substantial amount of powder cocaine, crack cocaine, and heroin, as well as firearms and ammunition, at 9 Westcott Street, Apartment 2A, Dorchester, Massachusetts ("the Westcott apartment") and in a hidden compartment inside his Range Rover. The caller said the Range Rover's license plate number was 55CT17 and that the Range Rover was registered to somebody other than Dickerson. With regard to firearms, the caller specifically stated that Dickerson kept a handgun and an AK-47 assault rifle in the Westcott apartment. The caller also stated that he had seen Dickerson and others loading "banana clips" with ammunition for the assault rifle. The caller stated that Dickerson's date of birth was November 19, 1973.

The police independently corroborated much of what the informant told them. According to BPD records, Dickerson was born on November 19, 1973. He had been arrested on January 2, 2003 and had provided the Westcott apartment as his address. At the time of that arrest, Dickerson identified his mother as Janet Royston. The Westcott apartment is also listed as Dickerson's residence on his Massachusetts driver's license. According to the Massachusetts Criminal History Systems Board record of Dickerson's prior adult criminal history, with which

---

[1]The government will establish these facts at a hearing on the defendants' motions.

the police were familiar in February 2004, Dickerson was convicted of possession of a Class B substance with intent to distribute on four occasions, in 1994, 1995, 1996, and 1997. He was also found delinquent as a juvenile, in 1988, on a charge of manufacturing a Class B substance.

Shortly after receiving the anonymous tip concerning Dickerson, BPD officers began surveillance of the Westcott apartment. Surveillance revealed two cars, a Range Rover bearing Massachusetts license plate number 55CT17 and a Toyota Camry bearing Massachusetts license plate number 74NH19 parked in the immediate vicinity of the Westcott apartment. According to records maintained by the Massachusetts Registry of Motor Vehicles, the Toyota is registered to Dickerson at the Westcott apartment; the Range Rover was registered to another person.

Surveillance in late February and early March 2004 revealed that the Range Rover was used more than the Toyota but that the Toyota did not remain parked in the same location during the entire period. During surveillance, officers saw Dickerson engage in at least two transactions that, based on their training and experience, they believed to be illegal drug transactions. On one occasion, the transaction involved a man who had previously convicted of a drug trafficking offense; on the other, the transaction involved a man who, at the time of the transaction, was under indictment in Suffolk Superior Court for drug trafficking. Based on the paucity of foot traffic to and from the Westcott apartment and the fact that the visitors to the Westcott apartment appeared to be drug dealers, the officers involved in the investigation came to believe that Dickerson was supplying drug dealers as opposed to drug users.

On March 8, 2004, BPD officers conducted a "trash pull" at the Westcott apartment, *i.e.* they took possession of and examined the contents of rubbish barrels put out for collection in front of 9 Westcott Street. Among the rubbish collected, officers discovered the following,

among other things:

    (a)    A large green plastic bag containing personal papers in the name of Janet Royston, Dickerson's mother.

    (b)    A smaller black plastic bag inside the first green bag, in which officers found four sandwich bags containing white powder residue, a sample of which tested positive for cocaine. That smaller bag also contained numerous cut off plastic baggies.

    (c)    A second large green plastic bag inside of which were personal papers bearing Dickerson's name and the address of 9 Westcott Street, #2 Dorchester, Massachusetts. Inside this large bag was a small white plastic bag containing numerous cut off plastic baggies.

Based on the officers' training and experience in narcotics investigations, the recovery of sandwich bags with residue and numerous smaller cut off plastic baggies indicates large quantities of drugs being re-packaged into smaller packages for re-distribution.

Based on the above, among other information, the BPD obtained warrants to search the Westcott apartment and the Range Rover parked outside. On March 9, 2004, BPD officers executed those warrants.

    **B.**    **Execution of the Search Warrant at the Westcott Apartment**

As BPD officers approached the Westcott apartment to execute of the search warrant, they saw Dickerson in the front attic window looking out toward the officers. Officers next saw Dickerson retreat from the window. Officers knocked on the front door of the Westcott apartment and announced their authority to execute a search warrant. After waiting

approximately 10 to 15 seconds and hearing no response, officers broke down the door and entered. Upon entering the apartment, officers found Dickerson hiding in a closet in the attic.

After advising Dickerson of his rights under <u>Miranda</u>, a police officer told Dickerson that the BPD had pulled his trash and had evidence that Dickerson was dealing drugs. Dickerson, in response, said he did not have anything. During the search of the Westcott apartment, officers found a shoe containing several grams of a white substance which, based on their training and experience, they believed to be crack cocaine. (The Massachusetts Department of Public Health Laboratory has since determined that it was in fact crack cocaine.) The crack cocaine was packaged in eight plastic bags. When shown the crack cocaine, Dickerson stated that he had forgotten he had that. Also during the search of the apartment, officers found a scale suitable for weighing narcotics, several boxes of small plastic bags, and car keys belonging to the Toyota and the Range Rover.

When an officer questioned Dickerson about his possession of an AK-47 assault rifle, Dickerson stated, "That wasn't even mine; I was like the third or fourth man in on that thing." Dickerson went on to state, "My boy already sold that to someone else." Dickerson then, in the officers' presence and in an apparent attempt to cooperate in the recovery of the assault rifle, called someone on his cell phone to try to ascertain the whereabouts of the assault rifle.

An officer asked Dickerson what vehicles Dickerson used. Dickerson stated that he only had a Range Rover. The officer then asked Dickerson if he owned a Toyota. Dickerson denied owning a Toyota. When the officer told Dickerson that the Toyota parked on the street was registered under Dickerson's name, Dickerson finally admitted, "Oh yeah, I got that when I first got out of jail from my friend, but it don't run right."

Boston Police Sergeant Detective William Feeney then executed the search warrant on the Range Rover. Sergeant Feeney was assigned to conduct this search because he has expertise in locating electronically-activated hidden compartments in automobiles (also known as "hides"). Based on Sergeant Feeney's experience, such hides are often used by drug traffickers to conceal contraband. Sergeant Feeney discovered no such hides in the Range Rover.

Sergeant Feeney then used a mirror to examine the undercarriage of the Toyota. He saw that the exhaust tunnel in the middle of the undercarriage had been blocked off. Based on his training and expertise, Sergeant Feeney immediately recognized the altered exhaust tunnel as a typical feature in cars that have had hides installed. Sergeant Feeney then searched the Toyota and discovered an elaborate hidden compartment mechanism in the passenger area. Inside the compartment Officer Feeney found approximately 57 grams of a substance that the Massachusetts Department of Public Health Laboratory has determined to be crack cocaine. Along with the crack cocaine, Officer Feeney found a urinal cake and two air fresheners. In the same compartment, Officer Feeney found a .40 caliber Ruger firearm loaded with eleven rounds of ammunition.

### III. Argument

#### A. Motion to Suppress Evidence – Warrantless Search (Docket # 22)

##### 1. The Search of the Defendant's Vehicle Was Permissible Under the Automobile Exception to the Warrant Requirement

A warrantless search is valid if it satisfies any of the well-delineated exceptions to the general warrant requirement. California v. Carney, 471 U.S. 386, 390 (1985). Under the so-called "automobile exception" to the Fourth Amendment's warrant requirement, the police may search an automobile without a warrant if they have "probable cause to believe that it contains

contraband, evidence of a crime, or other matter that may lawfully be seized." United States v. Martinez-Molina, 64 F.3d 719, 730 (1st Cir. 1995). They may also search any closed container within the automobile that might conceal the object of the search. See United States v. Ross, 456 U.S. 798, 825 (1982); California v. Acevedo, 500 U.S. 565, 579-580 (1991).

"[P]robable cause to search a vehicle exists where the facts and circumstances known to the arresting officers are sufficient to cause a person of reasonable caution to believe the search is justified. That is, there must have been particular facts indicating that, at the time of the search, the vehicle or a container within it carried contraband, evidence of a crime, or other seizable matter." United States v. Martinez-Molina, 64 F.3d at 730 (citations omitted).

The question is whether, based on the "totality of the circumstances," there was "a fair probability that contraband or evidence of a crime" would be found in the place that was searched. Illinois v. Gates, 462 U.S. 213, 238 (1983). Where, as here, the justification for the search was based in part upon information the police obtained from an informant, relevant considerations include the whether the police were able to independently corroborate details of the information supplied. Id. at 238-242.

Applying the totality of the circumstances standard to the this case, it is clear that, based on a host of factors, the police had probable cause to believe the Toyota contained contraband before Sergeant Feeney commenced the search of that automobile. First, the police had more than probable cause to believe that Dickerson was engaged in drug dealing. They observed transactions that appeared to be drug deals; they found evidence, in the trash pull, that Dickerson was handling large volumes of drugs; they found crack cocaine in the defendant's residence, which Dickerson admitted he had "forgotten about."

Second, an informant had told the police that Dickerson had a hidden compartment in one of his vehicles, albeit specifying the Range Rover. While the precise location of the hide turned out to be inaccurate, the credibility of the informant's assertion that Dickerson had an automobile hide was bolstered by the police's independent corroboration of the key aspects of the informant's account. Specifically, the police had corroborated that Dickerson resided at the Westcott apartment; had a birth date of November 19, 1973; drove a Range Rover registered to someone else; was in possession of illegal drugs; was handling large quantities of such drugs (as revealed by the trash pull); and had been in possession of an AK-47 assault rifle. Moreover, the informant spoke of having personally seen these things, which an important indicator of reliability. See United States v. Cochrane, 896 F.2d 635, 641 (1st Cir. 1990 ).

Third, Dickerson falsely denied ownership of the Toyota. It was not until confronted by the police that he admitted owning the car. The police could naturally infer from this false denial that Dickerson was concealing something incriminating in the Toyota. Moreover, despite Dickerson's assertion that the Toyota did not "run right," police surveillance had revealed that the car had been moved in the days leading up to the search.

Finally, and central to the probable cause to believe illegal drugs were concealed in the Toyota, Sergeant Feeney observed that the Toyota had a hidden compartment of the type that Feeney knew – based on having discovered such compartments on numerous prior occasions – to be used by drug dealers to conceal illegal drugs.

Nor is there any merit to Dickerson's claim that the police lacked probable cause to search the Toyota's hidden compartment because it was a closed container. As an initial matter, the Supreme Court has held that if police officers have probable cause to search a vehicle, they may

conduct a warrantless search of every part of the vehicle and its contents, including closed containers, that might conceal the object of the search. United States v. Ross, 456 U.S. 798,819-20 (1982). Here, not only was there probable cause to search the Toyota, that probable cause was specific to the hidden compartment. Courts have recognized that an officer's location of a hidden compartment of the type that, in the officer's experience, is often used by drug traffickers to conceal contraband, can contribute significantly to the probable cause required to search the compartment. See, e.g., United States v. Kincaide, 145 F.3d 771 (6th Cir. 1998)(upholding probable cause finding where police knew defendant was planning a drug delivery, he moved the vehicle to a position in the parking lot where it could be viewed from the defendant's apartment, the apartment was strewn with evidence of drug trafficking, and officer recognized a secret compartment in the undercarriage of the vehicle and knew from experience that such compartments were used to transport drugs and money); United States v. Bullock, 94 F. 3d 896,899-900(4th Cir. 1996)(probable cause to search concealed compartment where officer observed a large roll of cash, two cellular telephones, a beeper, ammunition, and a secret compartment, often used, in officer's experience, by drug traffickers to conceal contraband); United States v. Patterson, 65 F.3d 68,71-72 (7th Cir. 1995)(same where officers observed heavy odor of air freshener, a cellular phone, defendant's nervous disposition, fast-food wrappers strewn around the car, inconsistent stories regarding previous travel arrangements, a drug dog alerted to the odor of drugs, and the officers noticed screws missing from the tailgate interior.); United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993) (probable cause to arrest motorist upon discovery of hidden compartment where officer knew motorist to be illegal alien and where motorist appeared nervous and had no luggage despite claiming he was traveling from Chicago to

Los Angeles).

### 2. Evidence Seized in Toyota Is Independently Admissible at Sentencing

Even if the evidence seized in the car had been taken in violation of the Fourth Amendment, it is nonetheless admissible at a bifurcated sentencing proceeding. See United States v. Acosta, 303 F.3d 78, 86 (2002). In Acosta, the First Circuit followed the ten other circuits to have addressed the issue:

> Given the great weight of the precedent and following the unanimous, reasoned approach of our sister circuits, we hold that the exclusionary rule does not bar the use of evidence seized in violation of a defendant's Fourth Amendment rights in sentencing. We leave open the question of whether the exclusionary rule would bar the use of evidence when police intentionally act in violation of the Fourth Amendment in order to increase a defendant's sentence.

Id. The court explained that "the deterrent effect of the exclusionary rule does not outweigh the detrimental effects of excluding reliable evidence on the court's ability to meet its goal of proper sentencing." Id. at 85.

With regard to whether, in this case, "police intentionally act[ed] in violation of the Fourth Amendment in order to increase [the] defendant's sentence," see id. at 86, there is no indication of such an intention. Rather, the evidence demonstrates that the police proceeded on the good faith belief that probable cause existed to believe the Toyota contained illegal drugs.

> **B.    Motion to Suppress Evidence (Alleged Failure to Knock and Announce (Docket # 24)**
>
> **1.    There Was No Knock and Announce Violation**

Law enforcement officers executing a warrant must knock on the entry door of a home and announce their presence and purpose before attempting forcible entry, except in certain limited circumstances which render announcement unreasonable. United States v. Sargent, 319 F.3d 4, 8 (1st Cir. 2003)  In Wilson v. Arkansas, 514 U.S. 927 (1995), the Supreme Court held that the common law requirement that officers announce their identity and intention before entering a home to execute a search is part of the broader Fourth Amendment inquiry into the reasonableness of the officers' entry. Id. at 931.  In this case, notwithstanding the defendant's assertion to the contrary, and as set forth in the police report documenting execution of the search warrant, before officers entered the Westcott apartment, they knocked on the door and announced themselves to be police officers executing a search warrant.  Thus, as will be established at a hearing on this matter, the defendant's claim is without merit as a matter of fact.

Moreover, although not raised in the defendant's motion, the length of the police delay in entering the premises was reasonable under the circumstances.  See Sargent, 319 F.3d at 8.[2]  The common-law "knock-and-announce" rule is designed to (i) protect whatever privacy interests the occupants may have in the residence, (ii) permit the occupants voluntarily to open the door so as to avoid damage to the property in the course of a forcible entry by the police and (iii) prevent occupants from initiating defensive measures against the police in a mistaken belief that the

---

[2] As both "no-knock" and "knock-and-announce" cases turn upon the identical reasonableness inquiry, decisions involving both types of searches are cited interchangeably. See Sargent, 319 F.3d at 8.

person attempting entry may be an unlawful intruder.  See Wilson v. Arkansas, 514 U.S. 927, 932 (1995).  There is no bright-line rule regarding the length of time the police must postpone a forced entry following their announcement; instead, each case is to be assessed on the totality of its circumstances.  See Richards v. Wisconsin, 520 U.S. 385, 394 (1997); United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998) (observing that fact-intensive reasonableness inquiry cannot be "distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance").

>As the First Circuit recently observed,

>Although the virtually limitless variety in the circumstances confronting law enforcement officers in these cases plainly precludes any mathematical rule, frequently the courts have approved brief delays in the 15-to-20-second range or less in fairly typical drug cases, see, e.g., United States v. Banks, 540 U.S. 31, 38 (2003) (15-20 seconds); United States v. Jones, 133 F.3d 358, 361-62 (5th Cir. 1998) (15-20 seconds); United States v. Bonner, 874 F.2d 822, 825 (D.C. Cir. 1989) (10 seconds); see also United States v. Pinson, 321 F.3d 558, 566 (6th Cir. 2003) (noting precedents for 15-second delay), somewhat less than the 25-to-40-second delay involved here.  Moreover, it was clear as well that the targeted drug (viz., packages of heroin) at the Antrim apartment was of a readily disposable type.  Cf. United States v. Maher, 185 F. Supp. 2d 826, 832 (W.D. Mich. 2001) (noting absence of such danger where police expect to seize large number of marijuana plants).

United States v. Antrim, ___ F.3d ___ (1st Cir. November 24, 2004)(slip op. at 8-9).

The Supreme Court's opinion in United States v. Banks, 540 U.S. 31, 38 (2003) is instructive because the Court approved a 15-20 delay where the exigency of a rapid entry was dramatically less than that present in this case.  The Banks Court stated that the question of timing "turns on the significance of exigency [requiring prompt entry into the search premises] revealed by circumstances known to the officers." 540 U.S. at 37; and see Graham v. Connor, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). In Banks, the exigency was the risk that the defendant would destroy drug evidence. Id. at 38. The police had no specific reason to believe the defendant was armed or posed a danger to the officers. See id. at 33 (discussing facts supporting issuance of search warrant). Indeed, the police had no indication anyone was home when they knocked and announced that they were executing as search warrant. Id. They only learned that Banks was in the apartment after they broke the front door with a battering ram and entered. Id.

In this case, as a starting point, the exigency that justified a delay of 15-20 seconds in Banks was present as well, because the police in this case were searching for drugs. But the exigency in this case is dramatically greater than that presented in Banks. This is so because the police had specific reason to believe that Dickerson not only armed, but armed with an assault rifle. Moreover, as distinct from Banks, the police here not only knew that Dickerson was home, they knew that Dickerson was aware that the police were approaching his house. Under the extremely dangerous circumstances presented here, it would be astonishing to find that a delay of 10-15 seconds – or indeed an even shorter delay – to be unreasonable.

    **2.**    **Even If the Police Had Violated the Knock-and-Announce Requirements, Suppression of Evidence Seized Would be an Unjustified Remedy**

Even if this Court were to find that the police officers' knock and announce violated the Fourth Amendment, suppression of the evidence seized during the resulting search would be an inappropriate remedy, because any such violation did not harm Dickerson's constitutionally protected interests. Where there has been an unlawful entry, the exclusionary rule requires the suppression only of evidence that is the fruit of the unlawful entry. See New York v. Harris, 495

13

U.S. 14, 20 (1990). As the Supreme Court explained in Nix v. Williams, 467 U.S. 431 (1984) "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Id. at 443. Here, the judicially-issued search warrant authorized the police both to enter Dickerson's apartment and to seize certain evidence. Dickerson would thus be in the same position had the officers knocked and delayed longer before executing the warrant.

Moreover, the seizure of the evidence from Dickerson's apartment was the fruit of the search warrant itself – an "independent source" – and not of any knock-and-announce violation. Cf. Murray v. United States, 487 U.S. 533, 542 (1988); Segura v. United States, 468 U.S. 796, 804-805 (1984). As the First Circuit stated in United States v. Scott, 270 F.3d 30 (1st Cir. 2001):

> An independent source permits use of the evidence because it breaks the causal chain between the constitutional violation alleged and the discovery of the evidence challenged. * * * The question in independent source cases is one of causation; suppression requires at least a finding that the challenged evidence would not have been obtained but for a constitutional violation as to the defendant in the case at issue.

Id. at 44-45, citing Segura, 468 U.S. at 814 ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence"), and United States v. Crews, 445 U.S. 463, 471 (1980) ("In the typical 'fruit of the poisonous tree' case * * * the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality.").

Here, even if the police had failed to knock and announce before entering Dickerson's

14

apartment, that failure would not have contributed to their seizure of drugs. The police seized the drugs because they had a valid, judicially-issued warrant, based upon probable cause, commanding them to search Dickerson's apartment. Nor does Dickerson contend that the drugs seized by the officers would not have been seized had the officers knocked, announced, and waited longer. That is, even if the mode of entry into the apartment was illegal, any failure by the officers to knock and announce did not produce the discovery of the evidence.

On a related note, the inevitable discovery doctrine, see Nix, 467 U.S. at 442-443, also compels the denial of Dickerson's suppression motion, because the evidence that resulted in his conviction was seized pursuant to a warrant that comported with the Fourth Amendment. See United States v. Jones, 149 F.3d 715, 716-717 (7th Cir. 1998) (observing that "[i]t is hard to understand how the discovery of evidence inside a house could be anything but 'inevitable' once the police arrive with a warrant; an occupant would hardly be allowed to contend that, had the officers announced their presence and waited longer to enter, he would have had time to destroy the evidence"); see also Wilson, 514 U.S. at 937 n.4 (1995) (reserving question whether inevitable discovery doctrine might preclude suppression remedy in impermissible no-knock entry case). An opposite result would be impossible to square with Nix and with decisions of the First Circuit that have applied the rule even where discovery of the evidence was far less inevitable. See, e.g., United States v. Procopio, 88 F.3d 21, 27 (1st Cir. 1996) (search of locked briefcase inevitable where police knew defendant was subject of bank robbery investigation: police would have contacted federal agent concerning briefcase even had they not opened it and seen evidence, and federal agent would have applied for warrant to search briefcase); Ford, 22 F.3d at 377-381 (applying inevitable discovery rule despite warrantless search of house because,

in absence of illegal search, agents inevitably would have applied for and received warrant based on untainted information establishing probable cause); United States v. Zapata, 18 F.3d 971, 978-979 n.7 (1st Cir. 1994) (applying inevitable discovery rule even assuming car search illegal, because car unregistered and uninsured and therefore "surely would have been impounded" in future and police would have conducted lawful inventory search after impoundment and discovered evidence); United States v. Silvestri, 787 F.2d 736, 740-741 (1st Cir. 1986) (applying inevitable discovery rule where initial warrantless search of house revealed key evidence).

     Although an individual's interests in being given the opportunity to comply with the law (by answering the police's announcement) and to avoid destruction of property, as well as his interest in privacy, are "not inconsequential interests," Richards, 520 U.S. at 393; Wilson, 514 U.S. at 930-932, they cannot override society's legitimate interest in prosecuting criminals based upon evidence obtained with a properly issued search warrant. Application of the exclusionary rule here would place the government in a worse position than it would have been in had there been no violation, and therefore, would impose unjustified costs on society.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's Motions To Suppress.

                        Respectfully submitted,

                        MICHAEL J. SULLIVAN
                        United States Attorney

BY:   /s/ John A. Capin
                        _____
                        John A. Capin
                        Assistant U.S. Attorney
                        (617) 748-3264