UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 04-10202-RWZ

UNITED STATES OF AMERICA

v.

EARL DICKERSON

MEMORANDUM OF DECISION

June 9, 2005

ZOBEL, D.J.

      Defendant Earl Dickerson seeks to suppress all evidence obtained in a search by the Boston Police Department that resulted in his being charged with possession with intent to distribute crack cocaine.  This evidence includes a firearm, ammunition, cocaine and statements made by the defendant.  The search occurred pursuant to a warrant for both 9 Westcott Street, Apartment #2 (the second and third floors of a two-family home) in Dorchester, Massachusetts, and a black 1997 Landrover automobile.  The Boston Police searched an additional automobile (green Toyota Camry) owned by the defendant but which was not covered by the warrant.  The basis for issuing the warrant included information provided by a confidential informant (the "CI") that defendant possessed an automatic rifle at his residence and stored drugs in a secret compartment in his Landrover.

      Defendant challenged the search of the residence on the ground that the police failed to comply with the "knock and announce" terms of the warrant, and he asserts

that the police had no grounds for conducting a warrantless search of the additional vehicle, the Toyota.  The government countered that sufficient time elapsed between announcement and entry into the residence and that additional evidence obtained during the initial search established probable cause for a warrantless search of the second vehicle.

### "Knock and Announce" Procedure

The government presented two witnesses who participated in the search.  The first, Detective Daniel P. Linskey, testified that he remained in front of the residence during the entry and observed the officers arranged in formation to coordinate the entry and search.  Det. Linskey said that the officer heading the line kicked the front door and announced the Boston Police Department's arrival.  Contemporaneously, Det. Linskey saw a black male in an upstairs window and, recalling the CI's allegation that defendant possessed an automatic rifle, yelled a warning to the officers who were prepared to enter.  The officers breached the exterior door as Det. Linskey delivered his warning, and he recalled an approximate ten-second lapse between the original announcement and the subsequent entry.  The exterior door led to a common foyer with two interior doors, one that led up a staircase into defendant's residence on the second and third floor.  Det. Linskey did not personally observe the breach of the interior door but testified that it did not transpire immediately, because the officers reassembled in their formation before entry into the residence.  He also testified that several of the officers were yelling "Boston Police" during the assembly and formation.

The government's second witness, Officer Richard Kelley, served on the entry

and apprehension team for the search at issue.  He said that the team included about sixteen officers, some carrying defensive shields, with half to approach the exterior door and the others to cover a rear door, and that the team's initial assembly around the residence was not quiet.  He corroborated Det. Linskey's testimony that ten or fifteen seconds passed between announcement and entry through the exterior door.  Officer Kelley testified that the first officer in line yelled Boston Police a second time before breaching the interior door approximately four or five seconds later.  Both Det. Linskey and Officer Kelley acknowledged that they did not consider ringing the doorbell to announce their presence before entering the residence.

Defendant submitted an affidavit regarding the circumstances at issue as recalled by his mother who was home before and during the search.  The parties stipulated that defendant's mother, Janet Royston, would testify to the facts presented in the affidavit, and defendant offered no further evidence.  According to the affidavit, Ms. Royston owns the property and residence at 9 Westcott Street and was in her bedroom on the second floor when the Boston Police breached the exterior door.  See ¶¶ 1 and 3, Royston Aff.  She heard "a loud crashing sound" but saw nothing when she checked the interior staircase leading from the second to third floor.  ¶¶ 3 and 4, Royston Aff.  She next checked the stairway leading down to the interior door on the first-floor common foyer.  See ¶ 5, Royston Aff.  While proceeding down these stairs, she witnessed a group of men break into the door and point guns at her, with some rushing past her up the stairs and others remaining to force her down and place handcuffs on her.  See ¶¶ 6-7, Royston Aff.  Ms. Royston said these men "never

3

identified themselves," but she eventually realized they were the police. ¶¶ 8-9, Royston Aff. She asked for information about the situation but was told by the police to "shut up." ¶¶ 9-10, Royston Aff. Ms. Royston also stated that "[a]t no time did [she] hear the police announce their presence by either ringing [her] doorbell, knocking on [her] door, or by any other means prior to their forced entrance to [her] home." ¶ 12, Royston Aff.

Whether the Boston Police appropriately executed the search warrant depends on whether the "knock and announce" procedure executed at the interior door complied with the standard for entry under the Fourth Amendment, and if not, whether the "knock and announce" procedure at the exterior door to the common foyer itself, alone, justified entry to defendant's private residence behind the interior door. A properly executed "knock and announce" procedure requires that:

> [a]s a general rule . . . police officers must announce their presence to possible occupants prior to attempting a forcible entry, and the length of the police delay in entering the premises – to enable any occupants to respond – must be a 'reasonable' one in the particular circumstances.

U.S. v. Antrim, 389 F.3d 276, 279 (1st Cir. 2004). In the instant case, the government provided credible testimony that the entry team officers knocked and announced themselves. Although Ms. Royston remembered no such warnings, defendant did not foreclose the possibility that she simply did not hear the announcements while she moved throughout the home upstairs to investigate the crashing sound. Although defendant pointedly noted that the entry team officers neglected to ring the residence doorbell, nothing required the officers to try all possible means for "knocking" and

4

"announcing" before forced entry, especially when they were concerned about defendant's possession of an automatic rifle as well as illegal drugs that may be easily disposed of. Furthermore, I credit Det. Linskey's testimony that he saw an individual at an upstairs window in the residence during the breach of the exterior door, and this person - later determined to be defendant - failed to respond to the Boston Police's visible efforts to gain entrance to the residence. Given the totality of these circumstances, defendant has not shown that the entry team's announcement was inadequate.

In considering the sufficiency of the time lapse between announcement and entry, "[t]here is no bright-line rule . . . instead, each case is to be assessed on the totality of its circumstances." Antrim, 389 F.3d at 279. Government witness testimony established a lapse of approximately five seconds between announcement and forced entry. When officers "wait a shorter period of time between the knock and announcement and the forced entry," the First Circuit relies on the "no-knock 'reasonable suspicion' analysis." U.S. v. Sargent 319 F.3d 4, 9 (1st Cir. 2003)("The only question is whether the choice of the police officers to gain forcible entry after hearing no response within five seconds was unreasonable under the Fourth Amendment."). Because "the presence of a reasonable suspicion of danger is properly analyzed at the time of *entry*," defendant's failure to answer a knock and announce procedure, "[c]ombined with other factors . . . can be enough to engender reasonable suspicion and permit forced entry." Sargent, 319 F.3d at 10 (emphasis in original). This analysis distills into "two key issues: whether it was reasonable for the police to

expect a response within five seconds after the announcements, and whether it was reasonable for the police to fear a threat to their safety given the circumstances." Sargent, 319 F.3d at 10.  The First Circuit found the five-second wait in Sargent to be constitutional based on several key facts, including that the officers had reason to believe that the defendant was home, alerted to the pending entry, and possessed knives and possibly a gun.  See Sargent, 319 F.3d at 10.  The instant case involves similar facts, as the Boston Police also believed defendant to be present in the residence and potentially armed and dangerous.  Det. Linskey believed that defendant observed the entry team from an upstairs window and, thus, knew of the pending entry.  This understanding, vocally communicated by Det. Linskey to his colleagues, combined with the fact that nobody arrived at the front door and the information that defendant possessed an automatic rifle adequately support a finding that the forced entry was reasonable and did not violate defendant's constitutional rights.

**Warrantless Search of Defendant's Car**

The admissibility of evidence seized from defendant's Toyota as a result of Boston Police's warrantless search depends on whether "law enforcement officers had 'a belief, reasonably arising out of circumstances known to the seizing officer,' that the vehicle 'contain[ed] that which by law is subject to seizure and destruction.'" U.S. v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004), quoting Carroll v. U.S., 267 U.S. 132, 149 (1925).  This belief is "the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers."  U.S. v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992). In determining probable cause, "[t]he fact that the contraband was in a container

6

in a locked, hidden compartment does not justify any extra measure of consideration." Lopez, 380 F.3d at 544.

     The Boston Police observed the Toyota before obtaining the warrant and knew it was registered in defendant's name but focused on the Landrover because of the CI's identification.  During the search and seizure of defendant's residence, entry team officers found several grams of a white substance believed to be crack cocaine.  A search of the Landrover produced nothing, but upon closer visual inspection of the undercarriage of the Toyota, Sergeant Feeney recognized certain modifications that were characteristic of cars with secret compartments, or "hides," for contraband.  When the officers questioned defendant about the Toyota, he initially declined ownership until confronted with the fact that the car was registered in his name.  A search of the Toyota and its hide produced approximately 57 grams of crack cocaine and a .40 caliber Ruger firearm with eleven rounds of ammunition.

     Defendant did not dispute Boston Police's right to view publicly the undercarriage of the car but objected to reliance on the modifications as sufficient indication that the Toyota contained contraband.  He is correct in asserting that a secret compartment, or hide, alone does not provide sufficient indication of contraband in a vehicle to establish probable cause.  When, however, law enforcement have reason to believe that an individual who owns or operates a vehicle with a hide is otherwise involved in illegal drug activity, these collective facts may suffice to establish probable cause.  In U.S. v. Patrick, for example, law enforcement conducted a warrantless search of a car they suspected to contain a hide and have been used by

7

the defendant in illegal drug activities.  The search there was not incident to an arrest, but the suspicion of a hide in combination with testimony to that effect by three confidential witnesses sufficed to establish probable cause.  See U.S. v. Patrick, 3 F. Supp. 2d 95, 101 (D. Mass. 1998).  The Patrick court noted that the government did "not assert probable cause for believing defendant used the [car] for drug transactions simply because it had information from [a witness] that this vehicle contained a hide for concealing drugs."  Patrick, 3 F. Supp. 2d at 101.  Instead, the government offered supplementary evidence through witness testimony that corroborated the defendant's involvement with drug activities.  In the instant case, the government relied on a host of additional facts including not only the CI's statements but also direct surveillance of allegedly illegal drug transactions engaged in by defendant, retrieval of drug repackaging material from defendant's trash and, on the day of the search, seizure of substances believed to be illegal drugs from defendant's residence.  The Boston Police also understood from the CI that defendant used an automobile in his drug activities, although the CI incorrectly identified the Landrover as that vehicle.  This evidence, combined with the direct observation of mechanical modifications indicating a hide, provided "a reasonably trustworthy basis for believing that a search of the vehicle would disclose evidence of a quantity of contraband or traces or other evidence of very recent transportation of contraband."  Patrick, 3 F. Supp. 2d at 103.

     Accordingly, both of defendant's motions to suppress evidence (#22 and #24 on the docket) are denied.

| | |
|---|---|
| _____ | /s/ Rya W. Zobel_____ |
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |